Argued January 20, affirmed May 6, 1971

LEE ROY HANSON, *Respondent, v.*
CUPP, *Appellant.*

484 P2d 847

*Jacob B. Tanzer,* Solicitor General, Salem, argued the cause for appellant. With him on the brief was Lee Johnson, Attorney General, Salem.

*Robert L. McKee,* Portland, argued the cause for respondent. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Before SCHWAB, Chief Judge, and FOLEY and THORNTON, Judges.

## SCHWAB, C. J.

This is an appeal by the defendant-warden in a post-conviction relief proceeding from an order vacating petitioner's second-degree murder conviction and granting a new trial.

■ The issue presented is whether or not evidence in the hands of the prosecution, but not disclosed by it to the defense was of such a character that failure to turn it over to the defense was a violation of due process.[1] We hold that the evidence amply supports the post-conviction judge's finding that it was a violation.

Petitioner Hanson met the deceased, Sharon Griffin, at a bar where she was working as a cocktail waitress on February 7, 1965, and made a date with her for the next night. He met her the next night, February 8, at the bar, where they drank until about

---

[1] The defendant-warden also assigns as error the refusal of the trial court to consider evidence adverse to the petitioner which came to the state's attention after the petitioner's trial on the merits. The evidence offered was not of such a character as to change the result here and there is therefore no need to consider this assignment.

2:30 a.m., February 9, when they left the bar together, driving away in Hanson's car.

At 11:25 a.m. on the morning of February 9, Hanson, while driving alone, was stopped and issued a traffic citation near Boardman, Oregon, about 150 miles from Portland. He stated he was going to Pasco, Washington. He arrived at Pasco which is in southeastern Washington a little over an hour after receiving the citation, and stayed in the Pasco area until noon on February 11, when he drove from Pasco to Vancouver, Washington, and thence to Seattle.

Sharon Griffin's body was discovered on Sager Road a short distance beyond the city limits of southeast Portland on Friday evening, February 12. Death was due to strangulation. Three pathologists testified at the trial. Two of the three fixed the time of death at some time between the early hours of Tuesday, February 9, and Wednesday, February 10; the other was of the opinion that death could have occurred any time between the early hours of Tuesday, February 9, and Thursday, February 11. It follows that if Hanson killed Sharon Griffin and deposited her body where it was found, just beyond the city limits of southeast Portland, he must have done so prior to 8:00 or 9:00 on the morning of February 9, since he was positively identified as being 150 miles east of Portland by 11:25 that morning, and the evidence shows that he was hundreds of miles from Portland for several days thereafter.

At the post-conviction hearing it developed that several people had volunteered information to the police and to the deputy district attorney who prosecuted this case. Information which, if true and accurate, would have exonerated the petitioner. The state concedes that these people did in fact come for-

ward in the manner and at the time indicated at the post-conviction hearing. The state also concedes that the defense had no knowledge of this until long after trial and, as a reason for not turning this information over to the defense prior to the trial, argues only that the volunteered information was not believable.

A Mrs. Trout testified that she had arranged to take care of the home of a Mr. and Mrs. Troh while they were away. This home was located at the top of Sager Road immediately adjacent to the area where Sharon Griffin's body was found. On February 9, en route to the Troh home, she arrived at Sager Road at about 1 p.m. The private road leading to the Troh house was blocked by an automobile occupied by a man and a woman. She asked the driver to move the car so that she could get by. He complied and she drove on to the Troh house and went about her business. At about 4:30 p.m., having completed her work, she came down the road and it was again blocked by the same car. This time the woman was standing outside the car and Mrs. Trout noticed her dress and her appearance. She described the woman's clothing as substantially similar to that found on the body of Sharon Griffin. She estimated the woman's age as somewhere in the mid-30's—Sharon Griffin was 26 at the time of her death. A few days later Mrs. Trout read of the murder and saw a newspaper picture of both Sharon Griffin and the petitioner. She then went to the Clackamas County police and ultimately told this story to the Multnomah County police and the deputy district attorney.

At the post-conviction hearing she testified that the newspaper picture of Sharon Griffin which she had seen bore only a slight resemblance to Sharon

Griffin.[⑧] Mrs. Trout was then shown two pictures of Sharon Griffin's body as it was discovered. She was also shown an earlier picture of Sharon Griffin without glasses and with her hair arranged as it was at death. She testified that all these pictures bore a strong resemblance to the woman she had seen on the afternoon of February 9. She also testified that the petitioner, who was present at the post-conviction hearing, was not the man she had seen on February 9.

The other three witnesses at the post-conviction hearing were young men named Barr, Piper and Morgan. Barr testified at the post-conviction hearing that he had given a written statement to the Multnomah County police before trial. His testimony was consistent with that statement, which was introduced at the post-conviction hearing.

Barr's testimony at the post-conviction hearing was that on the afternoon of February 9 when he was 19 and Piper and Morgan were 18 years of age, they had gone target shooting near the Troh house. On their way to engage in this activity they had passed a car in the same location that Mrs. Trout testified she had seen a car with a man and woman occupant. They took no particular note of the occupants at this time. After shooting for about an hour they returned and noticed the same car, which was then barring their way. Barr got out of his car and approached the vehicle. He noted a woman occupant sitting in the car with a man. The woman was crying. Barr recalled her as being about 20 years old and wearing shoulder-length brown hair with reddish tint and having a thin face.

---

[⑧] In the newspaper picture Sharon Griffin was wearing her hair differently from the way it was found to be at the time of her death. The newspaper picture showed her wearing glasses. At the time of her death she was wearing contact lenses.

He did not note her clothing. (These physical characteristics, so far as they go, are an accurate description of Sharon Griffin.) Barr further testified that on February 13, 1965, at the time Sharon Griffin's body was found, he viewed it and thought it was the body of the same woman he had seen on February 9. He immediately so advised the Clackamas County police who were at the scene. He testified that he was unable to say whether or not the petitioner was the man he had seen in the car.

Piper identified a picture of the body as a very good likeness of the woman he had seen in the car on February 9. He also testified that he was shown the body immediately after it was recovered and that it strongly resembled the woman he had seen in the car on February 9, and that he immediately gave this information to the Clackamas County police. He, too, gave a pretrial statement to the Multnomah County police.

Morgan testified only that he had seen a girl who appeared to be crying in the car. He did not view the body and could not positively identify either of the occupants from pictures.

The state made a strong case based on circumstantial evidence against Hanson. At the post-conviction hearing the state pointed to some internal inconsistencies in the testimony of the four witnesses. However, the inconsistencies were far from being of such a nature as to completely discredit them. The fact remains that if the jury had heard their testimony and concluded that the witnesses were truthfully recalling what they saw, and that their memory of events was accurate as to time, place and identification of the deceased, the jury would have been hard put to find Hanson guilty.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution has been the basis of many appellate decisions dealing with the duty of prosecutorial disclosure. United States Supreme Court decisions on the subject date from 1935, *Mooney v. Holohan*, 294 US 103, 55 S Ct 340, 79 L Ed 791, 98 ALR 406, to 1963, *Brady v. Maryland*, 373 US 83, 83 S Ct 1194, 10 L Ed 2d 215, when the Supreme Court said:

> "* * * [S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 US at 87.

We note that the language of *Brady* includes the words "upon request," but for the reasons we hereinafter point out we do not believe that this phrase is significant.

In *Mooney v. Holohan*, supra, the court held that where the prosecution obtained a conviction based on evidence which it knew to be perjured and at the same time suppressed evidence favorable to the defendant, such acts constituted a violation of due process because it was a deliberate deception of court and jury.

To the same effect see *Pyle v. Kansas*, 317 US 213, 63 S Ct 177, 87 L Ed 214 (1942), and *United States ex rel Montgomery v. Ragen*, 86 F Supp 382 (ND Ill, ED 1949).

In *Griffin v. United States*, 183 F2d 990 (DC Cir 1950), the District of Columbia Circuit expanded the rule of *Mooney* to include evidence which, although favorable to defendant, the court could not conclusively

say would be determinative of the issue of guilt or innocence.

In *United States ex rel Thompson v. Dye*, 221 F2d 763 (3d Cir 1955), the United States Court of Appeals for the Third Circuit held that:

> "* * * 'The suppression of evidence may be a denial of due process when it is vital evidence, material to the issues of guilt or penalty.' 123 F.Supp. 759, 762 * * *." 221 F2d at 765.

Thompson had been convicted of first-degree murder and sentenced to death. His defense was that he was too drunk at the time of the crime to formulate the necessary intent for first-degree murder, or alternatively, that his drunken state should mitigate his sentence. The court granted a new trial, concluding that since defendant's drunkenness was a central part of the defense theory, prosecutorial knowledge of the arresting officer's statement that the defendant was under the influence of alcohol at the time of arrest was vital to the defense.

*Thompson* is significant in that it represents a shift from concern with misconduct of prosecuting authorities as a fraud on the courts (*Mooney v. Holohan*, supra), to the harm to the defendant occasioned by such conduct. *Thompson* is also significant because in that case there was no active attempt to suppress the officer's statement and the district attorney honestly believed the officer to be mistaken. To the same effect see *People v. Savvides*, 154 NYS2d 885, 1 NY2d 554, 136 NE2d 853 (1956), in which the court stated:

> "* * * That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair." 154 NYS2d at 887.

■ In *Brady v. Maryland,* supra, the court said:

"The principle of *Mooney v. Holohan* is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused * * *." 373 US at 87.

*Brady* focuses the deprivation of due process squarely upon the harm to defendant and not upon the motives of the prosecution. It thus approves of cases holding "negligent suppression" to be a violation of due process. In this light it rationally matters not whether the evidence favorable to the defendant and in the hands of the state was or was not requested by the defendant. Nor does it matter whether it was negligently, accidentally or maliciously withheld. The sole questions are:

(1) Did the state have such evidence?

(2) Was it evidence of substantial significance for the defense—was it evidence which, if believed by a trier of fact, would be seriously considered by that trier of fact in determining guilt or innocence?

This rationale is consistent with *Barbee v. Warden, Maryland Penitentiary,* 331 F2d 842 (4th Cir 1964). Barbee was convicted of the unauthorized use of a motor vehicle and of assault with intent to murder. At his trial his gun was displayed to several witnesses, but was not introduced into evidence. Each witness identified it as "similar" to the one which Barbee had used to commit the crime. The defense was not told—and apparently neither was the prosecution—of police reports showing that the bullet recovered from the victim was not fired from that weapon, and that Barbee's fingerprints were not found on the car he was alleged to have used. There were, however, three eye-witnesses who identified Barbee as

the assailant. The state contended, in opposition to the petition for habeas corpus, that the undisclosed evidence had no probative value, that Barbee's attorney had not requested it, that the prosecutor had not known of it, and that no prejudice had resulted from the nondisclosure, in view of the other evidence. The court rejected all of these assertions. The court stated that the probative value was clear; that the defense counsel was not held to a duty to request information which he had no reason to suspect existed; that the fact that the prosecutor may not have known of it was irrelevant, since it was clear that other authorities did; and that prejudice had resulted, since it could not be said that the use of this evidence would not have affected the result. It held:

"* * * In gauging the non-disclosure in terms of due process, the focus must be on the essential fairness of the procedure and not on the astuteness of either counsel.",

and

"* * * If the police silence as to the existence of the reports resulted from negligence rather than guile, the deception is no less damaging." 331 F2d at 846.

Affirmed.