Argued April 20, affirmed June 1, reconsideration denied July 14, petition
for review denied September 21, 1976

STATE OF OREGON, *Appellant,*

*v.*

DAVID E. MICHENER, *Respondent.*

(No. C 75-09-3056, CA 5494)

STATE OF OREGON, *Appellant,*

*v.*

DAVID E. MICHENER, *Respondent.*

(No. C 75-09-3057, CA 5495)

STATE OF OREGON, *Appellant,*

*v.*

MALVENA GOETZ, *Respondent.*

(No. C 75-09-2827, CA 5496)

550 P2d 449

*Catherine Allan,* Assistant Attorney General, Salem, argued the cause for appellant. With her on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

*Jeffrey M. Kilmer,* Portland, argued the cause for respondent Michener. With him on the brief was Stephen Walker, Portland, for respondent Goetz.

Before Schwab, Chief Judge, and Langtry and Thornton, Judges.

LANGTRY, J.

## LANGTRY, J.

These cases present the single question of whether, because the defendants were denied an opportunity to conduct their own examination and analysis of breathalyzer test ampules used to measure the level of alcohol present in their circulatory systems at the time of their arrests, they would be deprived of their right to a fair trial by the admission of "breathalyzer evidence" held by the state. The circuit court agreed with defendants' contention that a due process violation would, in fact, result from the admission of such evidence and ordered its suppression. We affirm.

Defendant Michener was arrested and charged with violating ORS 483.992(2)—driving while under the influence of intoxicating liquor.[1] Pursuant to the terms of Oregon's "Implied Consent Law" (ORS 487.805—487.835) Michener submitted to a breathalyzer test. Subsequent to that test he was charged by separate citation with violating ORS 483.999 which prohibits the driving of a motor vehicle while having a blood-alcohol level of .15 percent or more.[2] In accordance with standard police practice the breathalyzer test ampule used was destroyed

---

[1] As part of a revision of Oregon's Vehicle Code, ORS 483.992 has been repealed as of July 1, 1976. (Oregon Laws 1975, ch 451, §§ 291, 292, p 904.) Enacted at the same time to become operative on July 1, 1976, ORS 487.540 (Oregon Laws 1975, ch 451, §§ 87, 292, pp 799, 904) provides:

"(1) A person commits the offense of driving while under the influence of intoxicants if he drives a vehicle while:

"(a) He has .10 percent or more by wieght of alcohol in his blood as shown by chemical analysis of his breath, blood, urine or saliva made under ORS 487.805 to 487.815 and 487.825 to 487.835; or

"(b) He is under the influence of intoxicating liquor, a dangerous drug or narcotic drug; or

"(c) He is under the influence of intoxicating liquor and a dangerous drug or narcotic drug.

"(2) Driving while under the influence of intoxicants is a Class A traffic infraction."

[2] ORS 483.999 has, as of July 1, 1976, been repealed. (Oregon Laws 1975, ch 451, §§ 291, 292, p 904.) See n 1.

immediately after the completion of the test.[3] Prior to being released Mr. Michener was also asked to perform, before video-tape cameras, several balance and coordination tests.

Prior to trial Michener's attorney notified the district court by affidavit of his discovery that the results of a breathalyzer test could be "double checked" by having a chemist make an analysis of the liquid remaining in the test ampule. Counsel also indicated that he had, reasoning that some doubt as to the accuracy of the breathalyzer results obtained by the arresting officer had been created by the evidence of his client's ability to perform physical movement tests without any difficulty, requested the district attorney's office to supply him with the test ampule used in Michener's examination and that his request had been denied because the ampule had been destroyed. Based upon this affidavit, a motion was made to suppress the breathalyzer test result held by the state as well as all testimony relating thereto. A hearing on that motion resulted in an order suppressing the challenged evidence. The state appealed to the circuit court.

Defendant Goetz was arrested on April 17, 1975, on similar separate charges and in the process was subjected to a breathalyzer examination.[4] The test ampule and its contents used in the examination of Goetz were also routinely destroyed by the officer administering

---

[3]The process by which the "breathalyzer" measures an individual's blood-alcohol level includes essentially three phases: (1) the collection of a measured amount of "deep lung"—alveolar—air from the suspect, (2) the introduction of the breath sample into a test ampule containing a yellowish-colored solution of .025 percent potassium dichromate, 50 percent sulphuric acid, and .015 percent silver nitrate where, over a period of 90 seconds, the alcohol present in the breath sample will react with the postassium dichromate to cause the solution to become proportionately clearer, and (3) the measurement of the amount of light passing through the test ampule relative to the amount of light simultaneously passing through a second ampule identical to the first in its pre-test condition, the difference in light transmissibility indicating the amount of alcohol present in the circulatory system. *See generally,* 2 Erwin, *Defense of Drunk Driving Cases,* ch 22 (3d ed 1975); Donigan, *Chemical Tests and the Law* (Fisher ed 1957).

[4]See nn 1 and 2.

the test following its completion. Goetz too was asked to perform various balancing and coordination tests before a video-tape camera. Tried in district court Goetz was acquitted of the charge of driving while under the influence (ORS 483.992(2)) and convicted of violating ORS 483.999. She then appealed the conviction to circuit court, moving to suppress the breathalyzer test result on the grounds that the state had "refused to make available, on demand, evidence created in the administration of the breathalyzer examination which would allow [her] to reexamine the results of the examination." The hearing on this motion was consolidated with the state's appeal in the Michener case because they present the same legal issue.

Having considered expert testimony relating to the efficacy of analyzing the contents of a used breathalyzer ampule as a means of checking the accuracy of the results initially obtained,[5] and observed the video tapes made at the time of the defendants' arrests, the circuit court thereafter made the following findings of fact and conclusions of law:

"* * * * *

"It is scientifically possible to independently retest the accuracy of a breathalyzer reading by chemical

[5] Appearing on behalf of the defendants, an associate professor of biochemistry at the University of Oregon Medical School, John Bentley, testified that he had, based upon three different experiments, concluded that once the test ampule solution had been exposed to alcohol, it would become chemically stable and that it would remain stable over an extended period of time if placed in an inexpensive laboratory jar and stored in a dark location. Dr. Bentley also described to the court a scientific process by which the contents of the test ampule could be used to independently determine the amount of alcohol present. Although acknowledging that this re-examination process was a simple and commonly known one, the state's expert, an associate professor of toxocology at the medical school, disputed Dr. Bentley's conclusion that the solution within the test ampule would remain stable after initially being exposed to a breath sample. This expert's opinion that the solution would continue to react over a period of time to the point that any retest would be impossible was admittedly based on a single experiment of limited scope. When asked on cross-examination whether, as a scientist, he would expect his own or Dr. Bentley's experiments—which he had not attempted to duplicate—to produce the more accurate results, he conceded that he "would be tempted to lean" to those of Dr. Bentley.

examination of the test ampule to determine if the original reading was, in fact, accurate. This retest can be done at a time which is a considerable time after the original testing up to and including at least nineteen months.

"The storage of the ampule is both economically and scientifically feasible and would not place a burden upon the police agencies.

"Having viewed the video tapes made at the time of the arrest of each defendant, I am of the opinion that the defendants do not appear sufficiently intoxicated as to rule out the reasonable possibility that an error could have occurred in the breathalyzer tests. Therefore, it could be of material assistance to the defendants to have the benefit of the ampules for a retest in the manner the evidence indicated is feasible. Such retest might be exculpatory of the defendant in each case herein.

"The cross-examination of the breathalyzer operator alone is not sufficient to give the defendants a right to a fair trial because of the wide discretion given the operator in the conducting of the test and handling of the instrument, and that scientifically it would be better to allow cross-examination based on scientific re-creation of the reading.

"\* \* \* \* \*."

Accordingly, the court granted defendant Goetz's motion and affirmed the order of the district court granting defendant Michener's motion. This consolidated appeal by the state followed.

In *Hanson v. Cupp,* 5 Or App 312, 484 P2d 847 (1971), we held that the intentional suppression of material evidence favorable to a defendant constitutes a violation of due process. In *Brady v. Maryland,* 373 US 83, 83 S Ct 1194, 10 L Ed 2d 215 (1963), where the government had withheld from the defendant an extrajudicial admission by his codefendant which was highly relevant to the issue of their respective responsibilities for the death of another, the Supreme Court specifically held that

"\* \* \* \* \* the suppression by the prosecution of evidence favorable to an accused \* \* \* violates due process

[ 528 ]

where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 US at 87.

Thus, the well-established rule requires the disclosure of evidence "favorable to an accused [which is] material either to guilt or punishment."[6] That the results of a breathalyzer test constitute material evidence on the issue of guilt or innocence where the charge is one of driving a motor vehicle while having an excessive amount of alcohol in one's blood is apparent. The materiality of that same evidence where the charge is "driving while under the influence" is also apparent when one considers that under the terms of ORS 483.642 different "presumptions of intoxication"—applicable in any criminal or civil case—are assigned to specific levels of blood-alcohol content.[7] Because the breathalyzer test results obtained by the state in these cases were material, other evidence

---

[6]Defendants have conceded that the state was not required to "disclose" the used test ampules under the provisions of any applicable statute. *See* ORS 135.815.

[7]ORS 483.642, which provides

"(1) At the trial of any civil or criminal action, suit or proceeding arising out of the acts committed by a person driving a motor vehicle while under the influence of intoxicating liquor, the amount of alcohol in the person's blood at the time alleged as shown by chemical analysis of the person's breath, blood, urine or saliva shall give rise to the following presumptions:

"(a) Not more than .05 percent by weight of alcohol in his blood, supports a disputable presumption that he was not then under the influence of intoxicating liquor.

"(b) More than .05 percent but less than .10 percent by weight of alcohol in his blood, is indirect evidence that may be used to determine whether or not he was then under the influence of intoxicating liquor.

"(c) Not less than .10 percent by weight of alcohol in his blood, supports a disputable presumption that he was then under the influence of intoxicating liquor.

"* * * * *."

has been repealed as of July 1, 1976. (Oregon Laws 1975, ch 451, § 291, p 904.) Under ORS 487.540, to take effect on that same day, one may be convicted of "driving while under the influence of intoxicants" if "[h]e has .10 percent or more by weight of alcohol in his blood * * *" *or* "[h]e is under the influence of intoxicating liquor * * *." Breathalyzer evidence will therefore continue to be of substantial materiality after the change in the law becomes operative.

[ 529 ]

affecting the "credibility" of those results would necessarily also be material in that they might be used for purposes of impeachment.

■ The question of whether the ampules requested by defendants would have yielded evidence favorable to them is, however, essentially impossible to determine with certainty at this point. Where a difference of opinion exists as to whether the evidence sought by the defendant is favorable to him and that evidence remains available, the dispute is resolved by means of an in camera inspection by the trial court.[8] This procedure is, quite obviously, not possible where, as here, the evidence sought has been rendered unavailable by the intentional act of the state.

In a somewhat different context the Oregon Supreme Court recently noted the difficulty involved in applying the *Brady* rule where the question of whether evidence demanded is "favorable to the accused" can only be resolved by means of a scientific test, concluding that in order to be entitled to disclosure in such a case the defendant must

> "* * * make at least *some* showing, to the extent reasonable under the circumstances of the particular case, to support at least a belief and contention in good faith that the evidence demanded is 'favorable' to the defendant and 'material' to his guilt or innocence." *State v. Koennecke,* 274 Or 169, 179, 545 P2d 127 (1976).

In *Koennecke* disclosure was held not to be required due to the fact that neither the affidavit in support of the defendant's motion nor the evidence produced at the hearing on that motion revealed "facts from which it appears that an examination and testing of [the evidence sought] will disclose evidence favorable to [the defendant]." 274 Or at 180.

Similarly, this court denied defendants the relief sought in both *State v. Jones,* 18 Or App 343, 525 P2d 194, Sup Ct *review denied* (1974), where there was "no reason to believe that the evidence [destroyed] was

[8] *State ex rel Dooley v. Connall,* 257 Or 94, 475 P2d 582 (1970).

favorable to or 'of substantial significance to the defense,' " (18 Or App at 345) and *State v. Hockings,* 23 Or App 274, 542 P2d 133 (1975), Sup Ct *review denied* (1976), where there was a "strong showing" that the destroyed evidence was "useless and of doubtful materiality," the defendant's claim that it was both material and favorable being based on "pure speculation." 23 Or App at 286. In *State v. Williams,* 11 Or App 255, 500 P2d 722 (1972), on the other hand, this court reversed a decision of the circuit court and granted the defendant a new trial where the evidence suppressed—the "rap sheet" of the homicide victim—"would reasonably have been anticipated to enable the production of 'evidence of substantial significance for the defense' * * *." 11 Or App at 260.

In *Seattle v. Fettig,* 10 Wash App 773, 519 P2d 1002 (1974), defendant was charged with driving while under the influence and moved for dismissal of the case on the grounds that the police had negligently destroyed a video tape of his performance of standard coordination and balancing tests at the time of the arrest, thereby denying him due process of law. The appellate court found that defendant's offer of proof with reference to the tape established a "reasonable possibility" that it would have "tended to rebut" the state's evidence while corroborating that of the defendant on the issue of intoxication. "Therefore," it held, "* * * the video tape was favorable within the meaning of *Brady v. Maryland* * * *." (10 Wash App at 776.)

In a California Supreme Court case the argument was made that the failure to produce used breathalyzer ampules deprived defendants of due process. Based upon extensive findings of fact by the trial court,[9] that court held that the state had, in fact, viol-

---

[9]"In its detailed findings the [trial] court found inter alia that it is always possible to retest the ampoule and contents to determine if it conforms to specifications and if it contained the requisite three cubic centimeters of solution; that it is always possible to determine whether there was in

ated its duty to disclose because there was a "reasonable possibility that [the evidence] would constitute favorable evidence on the issue of guilt or innocence. * * *" *People v. Hitch,* 12 Cal 3d 641, 649, 117 Cal Rptr 9, 527 P2d 361 (1974).[10]

■  We deem it apparent that the *Brady* rule requires disclosure of material evidence where a defendant establishes some reasonable possibility, based on concrete evidence rather than a fertile imagination, that it would be favorable to his cause. Whether the evidence remains available to the state, as was the case in *Koennecke,* or has been destroyed, as was the case in *Jones* and *Hockings,* is irrelevant to the question of whether the refusal to produce the evidence is violative of the state's duty to disclose.

■■  In consideration of these precedents and under the particular circumstances of the cases now before us, we conclude that the defendants have made a sufficient showing to support their assertion that, had the evidence—i.e., used test ampules—been available to them, it would have been both material and favorable to their defense. Evidence produced by the defendants below adequately demonstrated both that a meaningful analysis of the test ampules would have been possible and that there was a reasonable possibility that an error could have occurred in the initial administration

---

fact a 0.025 percent potassium dichromate solution; that optical defects in the glass of the test ampoule and of the reference ampoule may have an effect on the accuracy of the test; and that the accuracy of a retest will depend upon factors such as the time elapsed since the actual test, the manner in which the test ampoule and solution have been stored, and the continued chemical change in the contents of the test ampoule and that upon a retest the original test cannot be duplicated with 100 percent accuracy." *People v. Hitch,* 12 Cal 3d 641, n 1, 117 Cal Rptr 9, 527 P2d 361 (1974).

[10] *See* Note, *The Right to Independent Testing: A New Hitch in the Preservation of Evidence Doctrine,* 75 Colum L Rev 1355 (1975). *See also Lauderdale v. Alaska,* 548 P2d 376 (Alas 1976).

of the breathalyzer examinations.[11] Therefore, we conclude the showing required under the Oregon Supreme Court's ruling in *State v. Koennecke,* supra, was made in these cases.[12]

Affirmed.

---

[11] Contrary to an assertion by the state, we have found substantial evidence in this record to support the finding of the circuit court that "[i]t is scientifically possible to independently retest the accuracy of a breathalyzer reading * * *." *See* note 5, supra. As it is conceded that the video tapes viewed by the court indicated that defendants had little or no difficulty in performing physical coordination and dexterity tests administered at the time of their arrests, review of those video tapes by this court has not been necessary in this instance.

[12] These cases might be compared to State v. Superior Court, In & For County of Maricopa, 107 Ariz 332, 487 P2d 399 (1971), where disclosure was held to be unnecessary because the defendant had "failed to show how the post test chemical composition of the test ampoule, had it not been discarded, could have made a valid contribution to his defense." The court there also said that provisions of the implied consent law which allowed him to have his own doctor make tests are ample to afford him due process and the state cannot be required to "re-create" for him "conditions existing at the time of the original test." 107 Ariz at 334. Although ORS 487.810 provides that in addition to a breathalyzer test administered upon the request of a police officer, a person arrested for driving while under the influence may, at his own expense, have any other chemical test or tests performed at the time of his arrest, the undisputed evidence in this record was that in accordance with standard police procedure neither defendant was specifically informed of that right in these cases. *See also State v. Teare,* 129 NJ Super 562, 324 A2d 131 (Law Div 1974), *rev'd,* 133 NJ Super 338, 336 A2d 496 (App Div 1975), *rev'd,* 135 NJ Super 19, 342 A2d 556 (App Div 1975); *State v. Bryan,* 133 NJ Super 369, 336 A2d 511 (Law Div 1974).