Argued and submitted February 8, affirmed April 13, reconsideration denied May 27, petition for review denied July 19, 1983 (295 Or 446)

STATE OF OREGON,
*Respondent,*

*v.*

RICHARD JAY BODENSCHATZ,
*Appellant.*

(21-357b; CA A25061)

662 P2d 1

J. Marvin Kuhn, Chief Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Robert E. Barton, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

Before Richardson, Presiding Judge, and Van Hoomissen and Newman, Judges.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

Defendant appeals his convictions for robbery in the first degree and kidnapping in the first degree. The issues are whether the evidence showed that the kidnapping was done with a purpose that would bring it within the provisions of ORS 163.235 and whether defendant was entitled to discovery of the report of a polygraph examiner who had examined the victim. We affirm.

Defendant and his brother Bruce were hitchhiking. Their eventual victim Abrahams offered them a ride. Defendant sat in the back seat, and Bruce sat in the front. The men told Abrahams that they were going to the coast. He agreed to take them to the intersection of Highways 217 and 99.

After Abrahams drove to the vicinity of the intersection, Bruce pointed a pistol at him and ordered him to give his wallet to defendant and to drive to the coast. After removing a twenty-dollar bill from the wallet, defendant stated, "I have got his I.D. We know who he is and where he lives." When Abrahams asked Bruce to put the pistol away, Bruce stated, "No, it stays out."

Abrahams testified that he was warned at the very least five times during the ordeal that if he made a mistake that caused the police to stop his car "that the first [bullet] was for me and the second one was for the cop." Abrahams testified that the two men were "extremely jumpy." He was especially concerned about an accidental discharge because of Bruce's nervous behavior.[1] Bruce stated that he had not slept for about five days. When Abrahams explained the route he intended to follow to the coast, one of the men warned Abrahams not to "try any tricks here."

On the way to the coast, defendant stated that he had to urinate. When Abrahams looked for a safe place to stop the car, Bruce "pulled the gun again and said, 'When we tell you to pull over we mean pull over now.'" As they drove, Abrahams twice neglected to dim the car's headlights for oncoming trucks. Each time Bruce pulled his gun and stated, "Are you trying to signal somebody? Are you

---

[1] Abrahams tetified that during the trip to the coast defendant drank beer and "smoked some marijuana." He also felt that Bruce might be "speeded out."

trying to tip somebody off?" On several occasions defendant and Bruce told Abrahams that "if my brother doesn't get you, then I will." Near Tillamook, defendant told Abrahams that he had a "two shot Derringer" under his jacket.[2]

Abrahams testified that on several occasions Bruce worked the slide on his pistol and ejected a bullet. When Bruce asked defendant where the pistol's safety was located, defendant replied that Bruce did not need to know "because they meant business." At Tillamook, defendant bought some beer. As they continued to drive, Bruce told defendant to give him some beer. When defendant did not respond, Bruce reached back and grabbed the bag and ripped it. Defendant then stated, "You do that, you reach back here and grab like that again and I'll blow a hole through that seat you call a cushion there." After leaving Tillamook, Bruce told Abrahams that if he stopped and got out of the car, the brothers would take the car and leave. Abrahams declined, telling them that he would continue to drive. Abrahams testified that the area was remote and that he had no idea what might happen to him if he got out of the car.

At Lincoln City, Abrahams was told to stop at a convenience store where two marked police cars were parked, that this was his "test." Recalling Bruce's warning that if the car was stopped by the police Bruce would shoot him and the police, Abrahams exclaimed that Bruce was "crazy." Defendant responded that if Abrahams called Bruce crazy again, defendant would "take you out right now." Abrahams stopped the car. Bruce got out and went into the store. Before doing so, he passed the pistol to the back seat. Abrahams testified that Bruce stated that he wanted to see a woman who might be working in the store because "I think she might have some drugs or something." The woman was not working at the store that night. Bruce then returned to the car with a bottle of pop. After getting the gun back and putting it in his pocket, he ordered Abrahams to continue driving. Despite the fact that the brothers were at the coast, they evidenced no intent to terminate the kidnap. As the road narrowed, Abrahams "hit [his] turn signal and tapped [his] brakes and merged

[2] A second weapon was not found.

over." One of the men asked, "What are you trying to do? Are you trying to signal?" Immediately thereafter, the police stopped the car. Abrahams was ordered out. As he exited the car, Bruce pulled out the gun and said, "Don't say anything stupid." Abrahams told the police that there were two armed men in his car. After calling for reserves, the police ordered the two men to get out. As they left the car, defendant and Bruce shouted obscenities at the police. A struggle ensued. The two were subdued. The car was then searched, and a loaded pistol was found under the front passenger's seat.

■    ORS 163.225 provides, in relevant part:

"(1)   A person commits the crime of kidnapping in the second degree if, with intent to interfere substantially with another's personal liberty, and without consent or legal authority, he:

"(a)   Takes the person from one place to another * * *.

" * * * * *"

ORS 163.235 provides, in relevant part:

"(1)   A person commits the crime of kidnapping in the first degree if he violates ORS 163.225 with any of the following purposes:

" * * * * *

"(c)   To cause physical injury to the victim;[3] or

"(d)   To terrorize the victim * * *.

" * * * * *"

Defendant first contends that there was insufficient evidence to convict him of kidnapping in the *first* degree, because there was no evidence he intended to "terrorize" Abrahams.

In *State v. Nulph,* 31 Or App 1155, 1165, 572 P2d 642 (1977), *rev den* 282 Or 189 (1978), we held that:

" * * * To prove intent to terrorize, there must be evidence of a purpose to do more than that which is necessary to take or confine by force, threat or deception as

---

[3] Defendant was charged with kidnapping Abrahams "with the purpose of terrorizing and causing physical injury." ORS 163.235(1)(c) and (d). The trial court found that there was sufficient evidence to submit the kidnap charge to the jury on both theories. We agree.

described in ORS 163.215(1). Such a charge requires proof of an intent 'to fill with terror,' *see* Webster's Third New World Dictionary (1976). The term was included in the code to cover vengeful or sadistic abductions accompanied by taunting threats of torture, death or other severely frightening experience. *See, State v. Swaggerty,* 15 Or App 343, 515 P2d 952 (1973)."[4]

Viewing the evidence in the light most favorable to the state, *Jackson v. Virginia,* 443 US 307, 99 S Ct 2781, 61 L Ed 2d 560 (1979); *State v. Harris,* 288 Or 703, 609 P2d 798 (1980), we conclude that the evidence was sufficient to entitle the jury to find beyond a reasonable doubt that the kidnapping was particularly vengeful and sadistic and that it was accompanied by taunting threats of death or other severely frightening experience. *See State v. Krummacher,* 269 Or 125, 137-38, 523 P2d 1009 (1974). We find no error.

Defendant next contends that the trial court erred in denying his motion to produce the report of a polygraph examiner who examined Abrahams. The court granted defendant's motion to produce the questions asked by the examiner and the answers given by Abrahams. However, the court denied his motion to produce the report of the examiner.[5] He argues that he was entitled to production of

---

[4] The Commentary to the Oregon Criminal Code of 1971, p 128 (1975), defines the term "terrorize" as used in ORS 163.235(1)(d) as follows:

"'Terrorize' is defined by Webster's as meaning to fill with terror; 'to coerce, maintain power, etc. by inducing terror.' The dictionary defines terror as meaning 'intense fear. . . the quality of causing dread; terribleness.' Webster's New World Dictionary (Coll ed 1968). The verb form of the word seems particularly apt for use in a kidnapping statute; and the American Law Institute indicates that the term was employed in the Model Penal Code to cover 'vengeful or sadistic abductions accompanied by threats of torture, death or other severely frightening experience.' [Commentary, Tent. Draft no. 11 at 18 (1960)]. Section 99 adopts this view and is concerned with the *intent* or *purpose* of the actor and not with the subjective effect of his actions upon either the person kidnapped or other person." (Emphasis in original.)

[5] The trial judge stated:

"I guess what I'm leading up to is I'm going to deny the motion. And I do so, I guess, for two basic reasons: one is I believe our appellate court takes a more restricted view of the *Brady*-type argument in recent years than they have in the past, whereas they have a more liberal view, if you will, of the discovery statutes under the statutory provisions. Now, that's my perception, and it may be accurate or inaccurate. But I think that's a fair statement, and one which maybe nobody agrees with, including the appellate courts.

"But the second reason, and the more important one, is that this is not evidence of substantial significance. And in talking about that, I'm saying

the report under *Brady v. Maryland,* 373 US 83, 83 S Ct 1194, 10 L Ed 2d 215 (1963), in order to assist him in cross-examination and possible impeachment of Abrahams. He does not contend that he was entitled to the report under the discovery statutes. ORS 135.815 *et seq.*

■ Polygraph test results are not admissible as either substantive or impeachment evidence unless both parties consent. *State v. Green,* 271 Or 153, 531 P2d 245 (1975); *State v. Kersting,* 50 Or App 461, 623 P2d 1095 (1981); *aff'd* 292 Or 350, 638 P2d 1145 (1982).

■ ■ In order to show a *Brady* violation, a defendant must make at least some showing, to the extent reasonable under the circumstances of the case, to support at least a belief and contention in good faith that the thing sought is favorable to him and material to his guilt or innocence. *State v. Koennecke,* 274 Or 169, 179, 182, 545 P2d 127 (1976); *State v. Mower,* 50 Or App 63, 67, 622 P2d 745, *rev den* 290 Or 651 (1981). Defendant argues that, by having the examiner's report, he could have focused his cross-examination on those questions that he contends Abrahams had answered untruthfully.[6] Defendant failed to make a showing that the report he sought was favorable and material. *See Addicks v. Cupp,* 54 Or App 830, 834, 636 P2d 454 (1981), *rev den* 292 Or 568, *cert den* 459 US 842 (1982); *State v. Pew,* 39 Or App 663, 593 P2d 1198 (1979); *see also United States v. Alberico,* 604 F2d 1315 (10th Cir 1979), *cert den* 444 US 992 (1979); *United States v. Kosovsky,* 506 F Supp 46 (DC Okla 1980); *United States v. Kearney,* 436 F Supp 1108, 1112 (SD NY 1977) (issue is whether the evidence would have created a reasonable doubt of guilt that

that it cannot be believed nor considered by the trier of fact, and therefore it does not come within the due process argument of *Brady.* And I'm rejecting, you may gather by my comments there, the arguments that just mere trial preparation in and of itself is a sufficient reason. I don't think so and that's why I guess I say there is a restrictive reading to *Brady.* I don't think trial preparation in and of itself is sufficient.

"And on the impeachment, I can understand where perhaps zeroing in on certain questions would lead to more investigative efforts to find impeachment material, but as far as impeachment in the sense that the polygraph operator is going to do the impeaching by prior inconsistent statements or something like that, you have the other officers who are present at this interview that were just listened to. So I don't see that being an appropriate basis."

did not otherwise exist and does not focus on defendant's ability to prepare for trial). Defendant relies on *United States v. Oliver,* 492 F2d 943 (8th Cir 1974); *United States v. Hart,* 344 F Supp 522 (ED NY 1971); and *Hanson v. Cupp,* 5 Or App 312, 484 P2d 847 (1971). We have examined those authorities and conclude that they do not compel the result urged by defendant. We find no error.

Affirmed.

---

[6] At trial, defendant asserted that Abrahams lied about certain aspects of the episode.