**STATE**

v.

**Daniel WILLIAMS.**

**No. 83–504–A.**

Supreme Court of Rhode Island.

Aug. 16, 1984.

Eugene Coulter, Portsmouth, for plaintiff.

Kenneth R. Tremblay, Tremblay & Gorton, Portsmouth, for defendant.

## OPINION

BEVILACQUA, Chief Justice.

This case has been certified to this court from the District Court, second division, pursuant to G.L. 1956 (1969 Reenactment) § 9-24-27. The defendant, Daniel Williams, was arrested for drunk driving and submitted to a blood-alcohol examination conducted on a breathalyzer machine. Subsequently, the defendant moved to suppress the results of the breathalyzer test on the grounds that the police failed to preserve a sample of his breath in violation of his federal and state due-process and confrontation rights and in violation of his

federal equal-protection rights. After listening to arguments of counsel and reviewing their briefs, the trial justice certified to this court three questions of importance and doubt.[1]

The record is not disputed; both parties stipulated to the record submitted to us.[2] On March 16, 1983, shortly after 7 p.m., defendant was driving his vehicle on East Main Road in Portsmouth when he was stopped by Portsmouth police. He was then placed under arrest for driving under the influence of intoxicating liquor and was taken to the Portsmouth police station, where he was asked to submit to a breathalyzer test.

The defendant was advised of his rights, which he acknowledged by signing a breathalyzer rights form. The defendant exercised his right to counsel by telephoning his attorney, who came to the station and after consultation, defendant agreed to take the test. The defendant did not, however, exercise his right to contact a physician in order to obtain an independent examination. *See* G.L. 1956 (1982 Reenactment) § 31–27–2.

The breathalyzer machine used was a Smith & Wesson Model 900, one of several breathalyzer machines approved for use by the Rhode Island Department of Health. This machine determines the amount of blood alcohol through an electrochemical comparison process.

To obtain a suspect's blood-alcohol level from this machine, he or she must first blow deep-lung (alveolar) breath into a heated plastic tube. The tube then forces a fixed amount of this breath into a sample glass ampoule. The ampoule contains a chemical reagent composed of potassium dichromate in a sulfuric acid solution. This solution reacts to alcohol, causing the reagent to change color when dissolved with alcohol.

Prior to the test, the sample ampoule is balanced photometrically against a control ampoule. A beam of light is shown through both ampoules until a device called the null meter, which measures the amount of light each ampoule receives, is centered, indicating that each ampoule is receiving the same amount of light. One and a half minutes after the suspect's breath is blown into the sample ampoule, the chemical reaction between the breath sample and the reagent is complete. At this point, the light is again shown through both ampoules. If any of the potassium dichromate has been consumed by alcohol, the null meter will no longer be centered. The light is then moved until the meter is centered; the distance the light is moved is directly proportionate to the amount of potassium dichromate absorbed, which is directly proportionate to the amount of alcohol in the sample. The machine is capable of determining the amount of blood alcohol; the light passing through the test sample is reflected upon a photoelectric cell that activates an electric current, causing a dial on the face of the machine to move along a fixed scale that is graduated in terms of blood-alcohol content.[3] The machine then registers this score on a data-record card.

The Rhode Island Department of Health Regulations dictate that each suspect be given the test twice; the first test should

1. In order to be certified under G.L.1956 (1969 Reenactment) § 9–24–27, a question must be "of such doubt and importance, and so affects the merits of the controversy that it ought to be determined by the supreme court before further proceedings * * *."

2. Technically, the Attorney General is also a party to this action. Under Rule 24 of the Superior Court Rules of Civil Procedure, the Attorney General may intervene when the constitutionality of any statute is called into question in a matter to which the state is not a party.

Subsequent to oral arguments, a representative of the Attorney General filed a motion adopting the arguments of the town of Portsmouth. However, the state has not participated any further in this matter.

3. Because no experts testified at the hearing on the motion to suppress, our sole source of scientific information concerning the breathalyzer testing procedure comes from the record which contains, *inter alia,* the operating manual for the Smith & Wesson Model 900.

be at least fifteen minutes after arrest and the second should be at least thirty minutes after the original test. During the thirty minutes between tests, the suspect is observed to ensure that he or she does not burp, regurgitate, or ingest any substance. Should any of these events occur, the thirty-minute waiting period must start to run from that time to avoid invalid test results. In addition, the accuracy of the machine is tested after each test by testing an air mixture of known alcohol content. *See* Department of Health Rules and Regulations January 1974, as amended March 1983 at 6–7.

The defendant first submitted to the breathalyzer test at 8:08 p.m.; his blood alcohol level was recorded at 0.14 percent. A second reading of 0.11 percent was recorded at 8:40 p.m. The defendant was subsequently charged with driving under the influence of liquor in violation of § 31–27–2.

At his pretrial hearing, defendant moved to suppress the results of the breathalyzer tests. He concedes that the officer who administered the examination is qualified and certified by the Department of Health to conduct breathalyzer tests. The defendant also concedes that the officer conducted the test in accordance with Department of Health regulations and followed the operational checklist provided by the manufacturer of the machine.

The basis for defendant's motion to dismiss, however, is that the town of Portsmouth failed to preserve a sample of his breath for his examination. Although the Portsmouth police department saves sample ampoules, it lacks the means for preserving a sample of the breath itself. The ampoules are removed from the machine and inserted into glass vials that are then capped and preserved at room temperature in a file cabinet. During this process the ampoules are open and exposed to air before being sealed in the vials. Accordingly, what is saved is not a sample of the breath itself but only the chemical solution resulting from the reaction between the breath and the reagent as well as any room air that might enter the ampoule when it is briefly exposed during the capping procedure.

The parties agree that it is technologically feasible to preserve a sample of a defendant's breath. Indeed, some machines presently in use in Rhode Island currently have that capability. The Smith & Wesson Model 900 itself cannot preserve the breath, but a separate system consisting of a crimping device and an indium tube is available for such a procedure. The suspect would be required to blow once into the Smith & Wesson machine and once into the crimping device. The latter breath sample would be sent directly into the indium tube, where it would be separated into three separate parts for preservation. The reusable crimping device costs approximately $300 and each indium tube costs about $13.

The defendant's motion to suppress basically asserts that the evidence against him is his own breath sample, which was not and indeed could not be preserved. He asserts that as a result of this nonpreservation of his breath sample, he was deprived of an opportunity to independently examine the evidence against him thus depriving him of fundamental constitutional rights. He argued that the town of Portsmouth deprived him of these rights by failing to employ available measures for preserving his breath sample.

At a hearing on the motion, the trial justice apparently only heard the arguments of counsel; no witnesses were presented by either side. Rather than reach a decision on this issue, the trial justice certified three questions to this court:

"1. WHETHER the due process clause of the 14th Amendment to the Constitution of the United States and article 1, [s]ection 10 of the Constitution of Rhode Island require the Portsmouth Police to collect and preserve a discrete sample of the Defendant's breath at the same time a Breathalyzer test is given.

"2. WHETHER the complained of omission works to deprive the Defendant of his right to confront and cross examine the evidence against him, thereby depriving him of his right to a fair trial, according to the 6th Amendment to the Constitution of the United States and according to [a]rticle 1, [s]ection 10, of the Constitution of Rhode Island.

"3. WHETHER the omission by the Portsmouth Police to collect and preserve said sample deprived the Defendant of the equal protection of the laws according to the 14th Amendment to the Constitution of the United States."

In response, we answer all questions in the negative. We shall now detail our reasoning and conclusions.

██ In addition to an agreed-upon statement of facts, the record before us consists of the town's five exhibits: a copy of the breathalyzer rights form, the Smith & Wesson Model 900 instruction manual, the operational checklist, the Department of Health Regulations R31–27–ALCH (Rev'd March 1983), and a copy of the data-record card. In addition, the defense produced two exhibits for the record: defendant's motion to suppress and a copy of a District Court decision, *State v. Comeau*. This decision was included in the record as part of an agreement between the parties concerning the inherent-error factors existing in the use of a breathalyzer machine; the trial justice in *Comeau* made findings of fact relative to some of these factors which the parties to the present controversy wish to adopt. We cannot accept, as part of the record before us, findings of fact made by a trial justice in an entirely different case. Accordingly, we do not consider the *Comeau* decision to be appropriate to the instant case.

**4.** In order to test a suspect's blood-alcohol level on an Omicron Intoxilyzer machine, the suspect first blows into the machine for several seconds. The machine then captures a sample of the breath in a chamber through which infrared light is shown to determine the level of alcohol

**I**

The defendant asserts that the tested sample of his breath is both material and potentially exculpatory owing to the inherent-error factors involved in the testing. Accordingly, he asserts that the town's failure to preserve a sample of his breath violated his due-process rights under the Federal and State Constitutions. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *State v. Faraone*, R.I., 425 A.2d 523 (1981). The town argues that the facts of this case do not demonstrate that it failed to preserve material evidence that would be exculpatory for defendant.

### A. Federal Due-Process Claim

It is fundamental that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218. What remains less clear, however, is what kind of evidence constitutes favorable and material evidence to the accused. This problem becomes particularly acute when the evidence sought by a defendant is no longer in existence, such as the sample of defendant's breath in the instant case.

The United States Supreme Court recently addressed this issue as it applied to one method of testing blood-alcohol levels by a breath sample in *California v. Trombetta*, —— U.S. ——, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). The defendants in *Trombetta* were given a blood-alcohol test on an Omicron Intoxilyzer machine that recorded blood-alcohol levels that were over the legal limit for a person operating a motor vehicle in California.[4] *People v. Trombet-*

in the suspect's blood. After two samples are tested, the chamber is purged with clean air and tested. A reading of zero alcohol should be produced at that time. *See People v. Trombetta*, 142 Cal.App.3d 138, 141–42, 190 Cal.Rptr. 319, 321 (1983). Thus, unlike the situation with the

ta, 142 Cal.App.3d 138, 141, 190 Cal.Rptr. 319, 320 (1983).

The defendants subsequently moved to suppress the results of the tests on the ground that the state had failed to preserve a sample of their breath. The trial court denied the motions, and the defendants appealed.

The California Court of Appeals, however, held that due process mandates that "law enforcement agencies must establish and follow rigorous and systematic procedures to preserve the captured evidence or its equivalent for the use of the defendant." *People v. Trombetta,* 142 Cal.App.3d at 144, 190 Cal.Rptr. at 323.[5]

On review, the United States Supreme Court reversed, finding that no *Brady* violation occurred. The Court stated that the evidence to be used against the defendants was not the breath but the results of the intoxilyzer test; the breath merely provided raw data for the intoxilyzer machine. *California v. Trombetta,* —— U.S. at ——, 104 S.Ct. at 2532–33 (citing *Killian v. United States,* 368 U.S. 231, 242, 82 S.Ct. 302, 308, 7 L.Ed.2d 256, 264 (1961)). In discussing the *Brady* standard,[6] the Court

stated that the "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and also be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* —— U.S. at ——, 104 S.Ct. at 2534. The Court further stated that because the machine is certified by the California Department of Health and because the machine tests itself to purge traces of alcohol, "the chances are extremely low that preserved samples would have been exculpatory." *Id.* The Court did, however, concede that error could result but then determined that even if error occurred during every test, each of the stated means of creating error could be demonstrated by alternative means.[7]

The reasoning of the *Trombetta* Court applies to the case before us. The record before us only outlines one source of potential error, that caused by changes in background-frequency interference.[8] As in *Trombetta,* the results of the breathalyzer examination can be impeached at trial by establishing that such changes in background-frequency interference occurred. *See California v. Trombetta,* —— U.S. at

---

Smith & Wesson Model 900, no breath sample of any kind, pure or mixed with a chemical reagent, is available for retesting. Intoxilyzers in California, however, are calibrated weekly, and defendants have access to the calibration results. *Id.*

**5.** The court relied upon a previous California Supreme Court decision that held that the failure to preserve breathalyzer ampoules for subsequent retesting by a defendant violates the defendant's due process rights. *See People v. Hitch,* 12 Cal.3d 641, 527 P.2d 361, 117 Cal.Rptr. 9 (1974). Apparently, the ampoules employed by the breathalyzer machine discussed by the *Hitch* court differ from those employed by the Smith & Wesson Model 900 in that they do not expose the sample taken to room air. *See People v. Trombetta,* 142 Cal.App.3d at 142, 190 Cal.Rptr. at 321; *see also State v. Shutt,* 116 N.H. 495, 497, 363 A.2d 406, 407 (1976).

**6.** This requires the prosecution to preserve evidence that is both exculpatory to the defendant and material either to guilt or punishment. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963).

**7.** The *Trombetta* Court outlined the possible sources of error identified by the defendant and *amici.* The Court reviewed these sources and found that the defendants could raise these issues without resorting to breath samples. Faulty calibration could be raised with the weekly calibration samples. Improper measurements due to radio waves or chemicals appearing in the blood of an individual on a diet could be brought out by testimony at trial. Finally, any operator error could be brought out on cross-examination of the operator of the intoxilyzer. *California v. Trombetta,* —— U.S. ——, ——, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984).

**8.** The defendant's brief outlines several other factors that may affect breathalyzer test results. The record, however, contains no reference to these factors. Thus, we will not consider them. *Cf. State v. Karagavoorian,* 32 R.I. 477, 486, 79 A. 1111, 1114 (1911) (questions should not be certified where further evidence is necessary to determine the answers to those questions).

——, 104 S.Ct. at 2534. Indeed, the Department of Health requires law enforcement agencies to notify the department of any changes in background frequency interference as specified in the Department of Health regulations.[9] Accordingly, even if defendant's breath sample could be considered "exculpatory" because of any change in background-frequency interference, defendant is able to obtain "comparable evidence [of such a change] by other reasonably available means." *California v. Trombetta*, —— U.S. at ——, 104 S.Ct. at 2534. Moreover, the machine used in this case was inspected by Department of Health officials and certified to be free from effects of radio-frequency interference on January 13, 1983, just three months before defendant's arrest. Thus, we can find no violation of defendant's due-process rights under the Federal Constitution.

### B. State Due-Process Claim

A review of the opinions of other jurisdictions indicates that their determinations vary not on the legal aspects of the case, but rather they differ concerning the findings of fact relative to the scientific elements of breathalyzer examinations. *See People v. Richter*, 102 Misc.2d 285, 293–94, 423 N.Y.S.2d 610, 616 (1979).

Most courts that reject a defendant's *Brady* argument find that the ampoules are not material to either guilt or punishment. Some of these courts find that any evidence produced by retesting an ampoule is inadmissible at trial because such evidence lacks acceptability in the relevant scientific community. *See Commonwealth*

*v. Neal*, 392 Mass. 1, 13, 464 N.E.2d 1356, 1363 (1984); *State v. Canaday*, 90 Wash.2d 808, 814, 585 P.2d 1185, 1188 (1978).

Other courts have focused on the lack of any scientific evidence to support a defendant's claim that the ampoules are material evidence. In *Edwards v. State*, 544 P.2d 60 (Okla.Crim.App.1975), the Oklahoma Court of Criminal Appeals rejected the defendant's claim of faulty breathalyzer testing as speculation. The court found that the defendant had only raised the possibility that an ampoule could be defective without offering any expert evidence on the feasibility of retesting a used ampoule or the possibility that any subsequent examination of the ampoule could be in any way helpful to a defendant. *Id.* at 63; *see also, State v. Teare*, 135 N.J.Super. 19, 342 A.2d 556 (1975); *State v. Larson*, 313 N.W.2d 750 (N.D.1981).

Few courts that reject defendants' claims that the test ampoules constitute material evidence ever reach the second prong of *Brady* analysis and determine whether the evidence would be favorable to the defendant. Those that do, require the defendant to "demonstrate a reasonable probability that the destroyed evidence would have been favorable to him." *State v. Larson*, 313 N.W.2d at 756. These courts hold that because the defendant cannot produce scientific evidence to show that retesting the ampoules can be material to guilt or innocence, the defendant cannot establish that subsequent testing can produce favorable evidence. *E.g., id.; State v. Helmer*, 278 N.W.2d 808, 811 (S.D.1979).

Conversely, those courts requiring the state to preserve the ampoule have found

---

**9.** Department of Health Regulations R31–27–ALCH (Rev'd March 1983), Part III, Section 2D, provides in part:

"5. Radio Frequency Interference Tests (RFI Tests).—Instruments will be certified as free from RFI using the Smith and Wesson protocol of September 10, 1982. Subsequent testing will not be required unless one of the following conditions occur:

(a) There is a change in the law enforcement agency's radio operating frequencies or power output.

(b) There is a change in the position, location, or type of base station antenna.

(c) There is a repair made or a calibration of the instrument, other than by the Department.

(d) There is a change in the operating location or general position of the instrument.

(e) There is a change in the general background RFI environment of the instrument's site.

"6. It is the responsibility of the law enforcement agency to notify the Department of any changes which are included in 5 (above)."

sufficient information to establish that retesting the ampoules produces scientifically reliable results. Rather than determine that the defendant is protected by certain procedures required for the test, these courts note that certain problems with the ampoules and their contents can cause erroneous readings without being noticed during the original testing. Accordingly, these courts find that the defendants have made a sufficient showing of materiality under *Brady*. *E.g., Scales v. City Court of Mesa*, 122 Ariz. 231, 234, 594 P.2d 97, 100 (1979); *State v. Michener*, 25 Or.App. 523, 528–31, 550 P.2d 449, 452–53 (1976).

Those courts requiring the state to preserve a defendant's breath sample also require a finding that the defendant has met the second prong of the *Brady* test. These courts do not require that a defendant establish that the breath sample would be exculpatory per se; a defendant must show a reasonable possibility .that the evidence would have been favorable to him or her. *See, e.g., People v. Hitch*, 12 Cal.3d 641, 649, 527 P.2d 361, 367, 117 Cal.Rptr. 9, 15 (1974); *Garcia v. District Court*, 589 P.2d 924, 929 (Colo.1979); *State v. Michener*, 25 Or.App. at 530, 550 P.2d at 453.

We recognize that despite the Supreme Court's ruling in *Trombetta*, we are free to adopt greater due-process safeguards concerning the admissibility of scientific evidence than those imposed by the Federal Constitution. *California v. Trombetta*, —— U.S. at —— n. 12, 104 S.Ct. at 2535 n. 12; *see also Oregon v. Hass*, 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570, 575 (1975); *State v. Benoit*, R.I., 417 A.2d 895, 899 (1980). However, we see no reason to depart from the standard enunciated by the *Trombetta* Court in applying the due-process clause of art. I, sec. 10, of the Rhode Island Constitution to the facts of this case. As we previously stated, defendant could challenge the accuracy of his breathalyzer test results through testimony concerning the possible changes in background-frequency interference. Indeed, "[i]n the case at bar there is

not the slightest suggestion or scintilla of evidence [in the record] that an examination of the [defendant's breath] would have produced evidence exculpatory to defendant." *State v. Faraone*, 425 A.2d at 525. Accordingly, the failure of the town of Portsmouth to preserve a sample of defendant's breath did not constitute a violation of defendant's due-process rights. *See id.*

II

The defendant argues that the failure of the town of Portsmouth to preserve a sample of his breath requires suppression of the breathalyzer test results because it deprives him of the right to confront and cross-examine the evidence against him in violation of the Sixth Amendment to the United States Constitution and art. I, sec. 10, of the Rhode Island Constitution. The town of Portsmouth maintains that defendant's rights to confront and cross-examine the test results are satisfied by the opportunity to cross-examine the operator of the breathalyzer machine.

Fewer jurisdictions have reached this issue than the due-process issue. Those courts that do not find a Sixth Amendment violation find that a defendant's right to confront the evidence against him or her is satisfied by the opportunity to cross-examine the officer who conducted the breathalyzer test. *E.g., State v. Phillipe*, 402 So.2d 33, 34 (Fla.App.1981); *State v. Canaday*, 90 Wash.2d at 816, 585 P.2d at 1189. Those courts that take an opposing view on this issue believe that "[t]he chemical contents of an ampoule and a police officer trained to operate a breathalyzer machine are not one and the same for cross-examination purposes." *State v. Booth*, 98 Wis.2d 20, 28, 295 N.W.2d 194, 199 (Wis. App.1980); *accord, Lauderdale v. State*, 548 P.2d 376, 381 (Alaska 1976); *Scales v. City Court of Mesa*, 122 Ariz. at 234, 594 P.2d at 100.

A review of these cases reveals that the courts are again persuaded by the amount and kind of scientific evidence before them.

*Compare State v. Canaday*, 90 Wash.2d at 815–16, 585 P.2d at 1189 *with Scales v. City Court of Mesa*, 122 Ariz. at 234, 594 P.2d at 100.

 On the basis of the record before us, we can only reach one conclusion: defendant's right to cross-examine and confront the test results is protected without resort to an additional sample of his breath. The defendant has failed to demonstrate how his confrontation rights are affected because police did not save an additional sample of his breath. We have already stated that any changes in background-frequency interference could be sufficiently explored by examining the operator of the machine, other members of the police force or officials of the Department of Health. Accordingly, we find no violations of defendant's confrontation rights under either the Federal or the State Constitution.

### III

The defendant's final argument states that because certain instruments having the capacity to retain a separate sample of a suspect's breath are available in several Rhode Island cities and towns, he was deprived of equal protection of the law in contravention of the Fourteenth Amendment to the United States Constitution because the machine used by the town of Portsmouth lacks the means by which to save a separate sample of his breath.

 The equal-protection clause does not require uniformity of procedure in all stages of criminal prosecution. *See Dohany v. Rogers*, 281 U.S. 362, 369, 50 S.Ct. 299, 302, 74 L.Ed. 904, 912 (1930). Rather, equal protection of the laws means "that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances." *Salsburg v. Maryland*, 346 U.S. 545, 551, 74 S.Ct. 280, 283, 98 L.Ed. 281, 288 (1954) (quoting *Missouri v. Lewis*, 11 Otto 22, 101 U.S. 22, 31, 25 L.Ed. 989, 992 (1880)).

 The defendant was granted equal protection of the laws by being given the breathalyzer exam on a machine approved for use by the state. The fact that other machines that are technologically more advanced exist, does not constitute a deprivation of the defendant's equal-protection rights. We have previously stated that on this record we cannot find that the town of Portsmouth has violated the defendant's due-process or confrontation rights by failing to save an extra sample of his breath. Thus, the defendant was afforded the same rights as any other drunk-driving suspect in the community. We therefore find that because the defendant was treated no differently than any other drunk-driving suspect, no equal-protection violation has occurred.

All the questions as certified are answered, the papers in this case with our answers certified thereon are remanded to District Court Second Division for further proceedings.