# COMMONWEALTH *vs.* ANTHONY OLSZEWSKI, THIRD.

Hampden. September 8, 1987. — March 3, 1988.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Practice, Criminal,* Disclosure of evidence, Preservation of evidence, Argument by prosecutor. *Evidence,* State of mind, Opinion.

In a first degree murder case in which only circumstantial evidence connected the defendant to the crime, the loss or destruction by the prosecution of highly relevant evidence unfairly deprived the defendant of his opportunity to present a defense. [755-757] NOLAN, J., dissenting.

At the retrial of a first degree murder case, the judge was to determine, in accordance with the principles expressed in *Commonwealth* v. *Willie,* 400 Mass. 427 (1987), whether sanctions are required for the Commonwealth's loss or destruction of evidence shown to be potentially exculpatory. [757-758]

At a murder trial, statements of the victim were improperly admitted as evidence of the victim's state of mind, where there was no showing that the victim's state of mind was ever transmitted to the defendant. [758-759]

In a criminal case, the judge erred in allowing a police officer to opine as an expert "within a reasonable degree of police certainty," but the error was not prejudicial where, even though no such standard exists, the police officer was competent to testify to his observations. [759]

In closing argument at a murder trial the prosecutor improperly argued his personal assessment of the credibility of a prosecution witness, improperly commented on the qualifications of a defense expert witness from personal knowledge, and improperly implied that the defendant had attacked the credibility of the police witnesses only because there was no other defense available. [760]

A murder defendant's motion for a directed verdict was correctly denied. [761]

INDICTMENT found and returned in the Superior Court Department on March 2, 1982.

The case was tried before *George C. Keady, Jr.,* J.

*Terry Scott Nagel & Linda J. Thompson* for the defendant.

*Elizabeth R. Dunphy & Brett J. Vottero,* Assistant District Attorneys, for the Commonwealth.

LIACOS, J. The defendant, Anthony Olszewski, appeals from his conviction of murder in the first degree. He argues error in connection with the following claims: (1) denial of his motion for a required finding of not guilty; (2) loss of evidence by the Commonwealth; (3) improper comments by the prosecutor in his closing argument; (4) refusal of the judge to allow the defendant to refresh the recollection of a witness; (5) allowance of opinion testimony from a Commonwealth witness; (6) sundry rulings arising from the defendant's cross-examination of certain witnesses; (7) allowance of evidence of the victim's state of mind; (8) the judge's admonition to defense counsel during his final argument; (9) composition of the jury; and (10) denial of the defendant's motion for new trial. The defendant also seeks relief under G. L. c. 278, § 33E (1986 ed.). We consider only some of these claims of error and conclude that the conviction cannot stand. Consequently, we reverse the conviction and remand this case for a new trial.

The relevant facts, as the jury might have found them, are these. The defendant and the victim, Joanne Welch, had been seeing each other with some regularity for two years. A short time before her death, they broke off their relationship. On January 28, 1982, the victim went to the defendant's home in West Springfield to retrieve some of her belongings. She and the defendant talked for a while, and he placed a box of her belongings in the back of her white Chevette automobile. She left at approximately 6 P.M. The defendant was seen walking away.

The victim had arranged to see a new friend, Steve Capezzone, that night. The victim did not return home that evening. She was last seen at a convenience store at approximately 8 P.M. on January 28. At 4 P.M. on January 29, the victim's body was discovered near a culvert on Shaker Road in Westfield. An autopsy indicated that the causes of death were strangulation, severe trauma, and exposure.

In the afternoon of January 29, before the victim's body was discovered, a West Springfield police officer went to an

area of the town known as Great Plains Road[1] to investigate suspicious objects that had been observed there. The officer discovered patches of red-stained snow in the road, a pair of women's shoes, and a chrome strip from an automobile. After the victim's body was found, the State police laboratory sent a chemist to the Great Plains Road site to assist in the investigation. Together, the chemist and the police officers located a button, two teeth, a man's belt, two earrings, a clump of hair in a snowbank, and a large bloodstain with hair in the blood. The chemist collected a sample of the red-stained snow by pressing a cotton swab against the stain. The cotton swab was taken to the police laboratory where the entire sample was consumed during the tests to determine whether the red stain was human blood, and for blood grouping. No conclusive blood grouping test could be performed.

The victim's white Chevette automobile was found about midnight on January 29, in the parking lot of a café in Westfield near the West Springfield line. The vehicle was taken to the West Springfield police department garage. The vehicle was dusted for fingerprints, tested, and inspected, both inside and underneath, for blood and fibers. The vehicle's contents were inventoried and photographed. A four-by-five-inch piece of floor carpet was removed. Also taken by the investigators from the vehicle were a window crank and a hair found on the surface of a plastic cup lid.

Later, the automobile was released to the victim's family. The release occurred before the police chemist's results were received. The defendant's first attorney agreed to the release of the automobile, at the request of the police department. The victim's family then had the automobile cleaned and repaired.

During their investigation, the police interviewed a number of people, among them three of the defendant's acquaintances, Harold Foley, his son Paul, and Dorian Black. These people told the police they had seen the defendant at a Mobil gas station from 6:45 P.M. until 7:30 P.M. on the night of the murder.

---

[1] Bear Hole Road, mentioned by other witnesses, is an extension of Great Plains Road.

The police discarded the notes of their interviews with these three people.

On February 1, 1982, the police interviewed a witness, Philip Strong, who provided a written statement for the police. The statement indicated that Strong and the defendant had been together during the evening of January 28, 1982, and referred to no confessions made by the defendant to Strong. On February 15, 1982, the police brought Strong back to the station, and he made a second statement. This statement provided the only direct evidence of the defendant's guilt. In his second statement, Strong claimed that the defendant had confessed to the murder and had told him the details of the crime.

While Strong was at the police station this second time, he was left alone with the police file containing investigatory materials of the case. Strong opened the file, took out the only copy of his first statement, tore it up, and discarded it in a wastepaper basket. He did not tell the police what he had done, and the police did not retrieve the pieces of the statement.

The trial before a jury began on January 12, 1983. The Commonwealth relied on Philip Strong's second statement as the main basis of its case. Philip Strong testified that the defendant had told him that he (the defendant) and the victim had left his home and had gone to Great Plains Road in West Springfield. According to Strong, the defendant said that he argued with the victim, started to strangle her, and dragged her out of the vehicle. He used a belt to strangle her, taking the belt in his teeth to pull it. The defendant then ran over her with the vehicle, put her back in the automobile, and brought her to Shaker Road in Westfield where he disposed of the body. The defendant drove to the parking lot and left the automobile. He went to a bowling alley, got some change, and crossed the road to use the telephone.

Of the physical evidence that had been gathered by the Commonwealth from the Great Plains Road site, from the victim's body during the autopsy, and from the victim's automobile, the Commonwealth either lost or destroyed the following: (1) the belt; (2) the blood sample taken from the Great Plains Road site; (3) blood samples taken from the parking lot

where the victim's vehicle was found; (4) a paint chip taken from the victim's skin; (5) a glass shard taken from the victim's skin; (6) the carpet swatch taken from the victim's vehicle; (7) an automobile window crank handle; and (8) the plastic cup lid section found in the victim's vehicle. Also lost or destroyed were the police interview notes of the three alibi witnesses (the Foleys and Black) and the first written statement of Philip Strong.

At trial, the defendant interposed an alibi defense. The jury returned a verdict of guilty of murder in the first degree on February 12, 1983. We discuss the bases for our reversal and only those issues raised by the defendant that are likely to arise at a new trial.

1. *Lost and destroyed evidence.* The defendant filed a motion to dismiss the indictment on the ground that the Commonwealth's failure to preserve evidence deprived the defendant of his constitutional right to a fair trial. In the alternative, the defendant moved that all testimony and evidence relating to the lost or destroyed evidence be excluded from trial.

Seven years ago, in *Commonwealth* v. *Redding,* 382 Mass. 154, 157 (1980), this court said: "We again stress that the prosecutor should make every effort to disclose to the defendant exculpatory evidence which is available to the prosecution." We emphasized in that case, citing *Commonwealth* v. *St. Germain,* 381 Mass. 256 (1980), that police are part of the prosecution and that the Commonwealth is to be held responsible for nondisclosure by them. Similarly, in *Commonwealth* v. *Lam Hue To,* 391 Mass. 301, 311 (1984), we defined prosecutorial misconduct to include not only lack of disclosure by the prosecutor but also the "inept and 'bungling' performance of the police, which is attributed to the [prosecutor]." See *Commonwealth* v. *Gallarelli,* 399 Mass. 17, 20 n.4 (1987) (prosecutor responsible for police loss of evidence even if he was unaware of it).

We have recognized that the loss of evidence which is material and potentially exculpatory poses special problems for a defendant because he is put in a position where he is unable to establish the exculpatory nature of the lost or destroyed evi-

dence. "Because the [evidence has] been destroyed, it is no longer possible to determine whether the defendant would have obtained any evidence of an exculpatory nature had [it] been made available to him for inspection or examination. To require the defendant at this stage to prove that the [evidence was] in fact exculpatory would, however, convert the disclosure duty established by *Brady* [v. *Maryland,* 373 U.S. 83 (1963)] and its progeny into 'an empty promise, easily circumvented by suppression of evidence by means of destruction rather than mere failure to reveal.' *United States* v. *Bryant,* [439 F.2d 642, 648 (D.C. Cir. 1971)]." *Commonwealth* v. *Neal,* 392 Mass. 1, 12 (1984). It is in this context that we stated in *Commonwealth* v. *Charles,* 397 Mass. 1, 13-14 (1986), that "[w]e have repeatedly stressed the need for *prosecutors and police* to do their utmost to *preserve and present* 'exculpatory evidence which is available to the prosecution'" (emphasis supplied).

In *Neal,* we indicated that, where the evidence is lost or destroyed, a defendant would be entitled to relief if he establishes "a 'reasonable possibility, based on concrete evidence rather than a fertile imagination,' that access to the [evidence] would have produced evidence favorable to his cause." *Commonwealth* v. *Neal, supra,* quoting *State* v. *Michener,* 25 Or. App. 523, 532 (1976). In *Charles, supra,* the court injected the factor of governmental "culpability." Thus, the test for relief was stated as follows: "When potentially exculpatory evidence is lost or destroyed, the culpability of the government will be weighed along with the materiality of the evidence and the potential prejudice to the defendant." *Id.* at 14.[2] More recently, we addressed the problem of lost or destroyed evi-

---

[2] The court did not consider in *Charles* that, apart from the Commonwealth's culpability, a defendant still may be unable to receive his constitutionally guaranteed right to a fair trial. It would seem that culpability, in the sense of bad faith destruction or falsification of evidence, could present an independent ground for remedial action. See *Miller* v. *Pate,* 382 U.S. 1 (1967). See also *Commonwealth* v. *Willie,* 400 Mass. 427, 434 (1987) (Liacos, J., concurring in part and dissenting in part). We do not, however, rest this opinion on such a ground.

dence in *Commonwealth* v. *Willie,* 400 Mass. 427 (1987). In *Willie,* the court rejected the argument that the duty of the Commonwealth is to make earnest efforts to preserve crucial evidence that its agents gather, and to see to it that the regular procedures employed by it and its agents are adequate to the task.[3] The court stated in *Willie* that, "when potentially exculpatory evidence is lost or destroyed, a balancing test is employed to determine the appropriateness and extent of remedial action. The courts must weigh the culpability of the Commonwealth, the materiality of the evidence and the potential prejudice to the defendant. . . . Our test does not require the Commonwealth to prove good faith or earnest efforts to preserve the evidence" (citations and footnote omitted). *Id.* at 432.

With this test in mind, we review what happened in this case concerning the lost or destroyed evidence. As to the identity of the murderer, the Commonwealth's case, apart from the testimony of Strong, was circumstantial. Although the defendant could have been found to have motive and opportunity to kill the victim, there was no physical evidence connecting him to the crime.[4] Despite ostensibly elaborate police investigation and collection (albeit not preservation) of evidence, including recovery of the alleged murder weapons (the belt and the victim's automobile), no fingerprint of the defendant, no blood sample type matching that of the defendant, no identification of the belt found (and lost) as being that of the defendant was put before the jury.

The prosecution, however, extensively used evidence derived from the physical evidence lost or destroyed. For example, the belt found at the scene of the crime, and supposedly used to strangle the victim, was lost. No one testified that it

---

[3] This is a part of the test stated in *United States* v. *Bryant,* 439 F.2d 642, 651 (D.C. Cir. 1971).

[4] The motive may have been inferred from the breakup of his intimate relationship with the victim (and perhaps their quarrel over money); the opportunity may have been inferred from the evidence that he was the last person seen with her (although this was disputed). The statement of the witness Philip Strong, as to the defendant's confession, is the only direct evidence of guilt.

was the belt of the defendant, but a photograph of the lost belt and another belt (this the defendant's) was admitted to allow the jury to infer from the photograph, because of their similarity of size, that the "murder" belt was that of the defendant. Also, a chemist was allowed to testify that the lost belt showed traces of blood. The victim's body yielded paint chips and a piece of glass. Some of those chips indicated blue paint; the victim's automobile (also a murder weapon) was white. The victim's automobile did not have any broken glass. Some of the paint chips and the piece of glass were lost, as was a bloody swatch of carpet from the victim's automobile. Also lost or destroyed were the swab of bloodstained snow taken from the murder scene and a plastic cup lid found in the victim's automobile. The interview notes of three alibi witnesses and the original statement of Strong, which supported the alibi, were also lost or destroyed.[5]

The loss and destruction of highly relevant evidence by the Commonwealth and its agents defeated the defendant's opportunity effectively to present a defense. The unsuccessful defense was alibi, coupled with an attempt to indicate that another automobile (not white, but blue) may have been involved. The prosecution was able, however, to undercut the claim of the alibi witnesses without the defendant's having recourse to the police notes of interviews with them taken shortly after the crime. The defendant also had no recourse to Strong's original statement which apparently (although Strong repudiated it) corroborated the alibi claim and could have been used effectively to impeach him. The defendant was unable to pursue effectively his claim that the automobile observed at the scene of the crime was dark, or blue, in color. The Commonwealth, on the other hand, was allowed to use the fruits of its investigation in a context where, by its acts, effective rebuttal was precluded.[6]

---

[5] Yet, the Commonwealth was allowed to submit expert testimony based on many of these items.

[6] Indeed, in his closing the prosecutor took advantage of this situation by arguing that all of the lost evidence, if it had been extant, would have helped the Commonwealth.

THE PROSECUTOR: "But a significant thing is the belt in the tree. I will grant you the belt was lost. We would have liked it, but I grant you that

Additionally, as we explain in part 2, *infra,* of this opinion, prejudicial hearsay as to statements allegedly made by the victim was improperly admitted. Given these circumstances, the defendant was not afforded a truly fair trial. Thus, the conviction cannot stand.

On remand, the judge, on proper showing by defense counsel that the lost or destroyed evidence is potentially exculpatory, must undertake the weighing test set forth in *Willie, supra* at 432-433. For each piece of missing evidence shown to be potentially exculpatory, the judge must weigh the culpability[7] of the Commonwealth and its agents, the materiality of the evidence, and the potential prejudice to the defendant. For example, in the case of the lost belt, the defendant argued that the belt could have had fingerprints, or some indicia of ownership by a third person (e.g., a worn belt hole) that could have ruled out the defendant as the owner or could have proved that some other person was present at Bear Hole Road when the crime was committed. The belt was potentially exculpatory.

The judge made a finding that the Commonwealth lost the belt through inadvertence. Weighing this inadvertence with the fact that the belt was alleged to be one of the murder weapons, and considering the great risk that the defendant would be prejudiced by evidence regarding the belt (the pictures and the blood test), we hold that the proper remedial action should have been the suppression of all evidence regarding the belt, in so far as such evidence would show it to be the defendant's.

---

the white chip of paint was lost. We would have liked it. All of the things that were lost in this case, the door handle, the blood, everything that was lost in this case, who would it have helped? The Commonwealth. It wouldn't have helped the Defendant. It would have helped the Commonwealth. . . ."

DEFENSE COUNSEL: "Your Honor, I ask that be stricken. There's no evidence to support that in this case at all."

There is no basis for the prosecutor's argument, and it was erroneous for him so to argue.

[7] " Culpability" and "bad faith" are not interchangeable terms. Negligence or inadvertence are less culpable than bad faith, but they are nevertheless culpable and must be accounted for in the balancing procedure.

In a different category from the belt and most of the other lost physical evidence is the evidence taken from the victim's vehicle. While at the West Springfield police garage, the automobile was dusted for fingerprints and was tested and inspected for blood and fibers, both inside and underneath. The contents were inventoried and photographed. The motion judge found that, upon the request of the police department, the defendant's first attorney agreed to the release of the automobile prior to receiving the chemist's analysis.

At a hearing on a motion to suppress the evidence gleaned from the automobile, the defendant's first attorney testified that he seen no need for further inspection of the automobile and had agreed to the release because "the State Police chemist had done his work." Once in possession of the automobile, the victim's family had it cleaned and repaired. By the time the defendant's second attorney discovered that evidence from the automobile was lost or destroyed, e.g., the carpet swatch and paint chips, there was no chance of retesting, replacing, or duplicating the evidence.

On remand, the judge must hold a hearing to determine whether the defendant's first attorney reasonably relied on the representation that the Commonwealth undertook responsible procedures in testing the vehicle. If the judge finds reasonable reliance, then the judge must follow the weighing test set out in *Commonwealth* v. *Willie, supra*.

The other piece of lost evidence that stands on a somewhat different footing is the first statement of Philip Strong. The defendant asserts, and we agree, that the statement was both exculpatory and material. The defendant further asserts that the destruction of the statement seriously impaired the defendant's opportunity to impeach Strong. Our review of the record indicates that the defense counsel fully described to the jury the circumstances of the making and the destruction of Strong's first statement. The defense thoroughly cross-examined, and effectively impeached, Strong. The judge properly admitted Strong's testimony.

2. *Victim's state of mind*. The Commonwealth called two coworkers of the victim, who testified at a voir dire hearing

that the victim had told them on the day she disappeared that she was going to get the money that the defendant owed her or that she (the victim) would tell the police of the defendant's involvement in the "Mobil robberies." The judge ultimately ruled that the witnesses could mention the "Mobil robberies," and the witnesses testified accordingly. Immediately thereafter, the judge instructed the jury that the testimony was admitted only for the limited purpose of revealing the victim's state of mind. The judge's allowance of this testimony was erroneous and prejudicial. The witnesses' testimony was irrelevant because there was no showing by the Commonwealth that the victim's state of mind was ever transmitted to the defendant.[8] See *Commonwealth* v. *Borodine,* 371 Mass. 1, 8 (1976), cert. denied, 429 U.S. 1049 (1977). Without this foundation, the statements were inadmissible and the judge's instructions were not curative. This evidence, absent a credible showing that the defendant was aware of the victim's statements, should not be admitted at the new trial.

3. *Opinion testimony of Commonwealth witness.* The judge erred in allowing a police officer to testify as an expert witness "within a reasonable degree of police certainty" that the chrome strip found at Great Plains Road originally came from the victim's automobile. The police officer was present when the strip was positioned on the vehicle, and he could state properly as a lay witness whether the strip fit the vehicle. The error here was that we do not recognize, as a standard, "a reasonable degree of police certainty." This error, however, was not prejudicial because the police officer was competent to give a shorthand expression in testifying to his observation. See P.J. Liacos, Massachusetts Evidence 100-103 (5th ed. 1981).

---

[8] The only evidence the Commonwealth presented regarding whether the defendant was aware of the victim's state of mind was the inadmissible "totem pole" hearsay statement by Officer Edward Sypek. Sypek responded, "Yes" to this question asked by the prosecutor: "And did Strong also tell you that Olszewski said to him that Joanne said in addition to the argument over the boyfriend that she was going to the police about him?"

4. *Closing argument.* We comment on some aspects of the closing argument of the prosecutor so as to preclude repetition at the new trial.

The defendant alleges that the prosecutor: (1) improperly interjected his personal assessment that a Commonwealth witness, Capezzone, should be believed; and (2) directly stated personal knowledge of defense witness Topjian's lack of qualifications.[9] It was improper for the prosecutor to comment on the credibility of a witness out of personal knowledge.

The defendant argues that the prosecutor's use of the "police on trial" maxim during closing argument was improper.[10] We agree. It was improper for the prosecutor to imply that "the only time a defendant would . . . attack the credibility of Commonwealth witnesses is when there is no other defense available." *Commonwealth* v. *Simmons,* 20 Mass. App. .Ct. 366, 371 (1985).

---

[9] The prosecutor argued in his closing statement: "Well, let me tell you this, I've been in this office for a long time. That kid got on the stand, Steve Capezzone, he was one of the classiest people I have seen, testified honestly and excellently. You saw him, you have a right to judge him for yourself. And make a comparison between him and his conduct on the stand and the Defendant. And then the person, Rick Robinson, and the records are here showing they worked that particular time, those two clean-cut kids came in here and testified. And this courtroom was filled with his name as though he were some sort of a sinister person. Well, you saw him, he's the kind of a person, if you had a sister you would like to have come home with her. Absolutely one of the finest witnesses that this case has produced."

Later in his argument, the prosecutor stated: "Now, they bring in Melvin Topjian and he is the first of their experts. I know Melvin Topjian. I have known him to be associated with the State Police, 1010 Commonwealth Avenue for ten years. But as he testified on the stand, he never had anything to do with forensic chemistry for over ten years. All he got involved in were drug matters because he only testified in the Court on two or three occasions."

[10] The prosecutor stated in closing: "[T]hat reminds me of a time a long time ago when I was in law school and I had a professor who was also the Dean of the school, who said, when you present a case and you're defending it, he said if the facts are against you, argue the law. If the law is against you, argue the facts. If the facts and the law are both against you, pick on the cops. That's exactly what we have here, exactly, pick on the cops."

5. *Motion for directed verdict.* At the close of the defendant's case, the defense moved for a directed verdict on the ground of insufficient evidence. We have examined the entire record, and, disregarding the evidence which was improperly admitted during the trial, we conclude that there was sufficient evidence to send the case to the jury.

*Judgment reversed.*

*Verdict set aside.*

NOLAN, J. (dissenting). I dissent. The jury clearly believed Philip Strong when he testified as to the defendant's confession of this crime with all its details. The court admits that Strong was "thoroughly cross-examined, and effectively impeached." Strong's first statement was made fully known to the jury.

Despite the unfortunate contretemps in connection with the missing evidence, there was no miscarriage of justice when the jury returned their verdict of guilty.